M. SIMPSON McCULLOUGH

*v.*

ABSECON BEACH LAND AND IMPROVEMENT COMPANY et al.

Where monumental calls in the description in a deed are fully identified and are sufficient in themselves to show the boundaries, the given courses and distances may be entirely disregarded.

On bill to quiet title.

*Mr. David J. Pancoast* and *Mr. Samuel H. Grey,* for the complainant.

*Mr. Henry M. Snyder, Jr.,* and *Mr. Peter L. Voorhees,* for the defendant.

McCullough v. Absecon Beach and Land Imp. Co.

PITNEY, V. C.

This is a bill to quiet title, filed under the act of March 2d, 1870. *Rev. p. 1189.*

The complainant alleges peaceable possession of the land in controversy, and in addition sets out his title, founded upon a deed dated February 14th, 1854, made by Somers, Lake and Adams, commissioners in partition appointed by the orphans court of Atlantic county, to one Overshine, and *mesne* conveyances from Overshine to him for a tract which is described by metes and bounds and said to contain two hundred and fourteen acres. The defendant corporation answers, and by its answer deduces its title by an unbroken line of conveyances from the proprietors, to wit, for one hundred and twenty-one one hundred and forty-fourths undivided parts, or about five-sixths of the tract in question. The other defendants, representing the remaining twenty-three one hundred and forty-fourths, have not answered, and require no further mention or notice. The defendant admits that the complainant's title to the tract described in the commissioners' deed is good, and that the parties to the partition proceedings upon which it was founded were the owners of the tract in question at the date of those proceedings. It in fact claims title from those parties, and limits its claim to land not included in the conveyance to Overshine under which the complainant claims, and asserts that it does not include or cover the land here actually in controversy. And that is the sole question in dispute in the cause, viz., Does the commissioners' deed above referred to cover and include, by proper description, the land in controversy?

The defendant, however, further denies the jurisdiction of the court, because, as it says, the complainant was not in peaceable possession. But I think that on that question the facts are clearly with the complainant.

The land in controversy comprises the extreme southwest end or point of Absecon beach. It contains about one hundred and fifty acres of land; is bounded on the southeast by the Atlantic ocean, on the southwest by Great Egg Harbor inlet, on the northwest by an inland sound called Beach thoroughfare, and on the

northeast by lands owned confessedly by the complainant, and it has been laid out on paper into streets and is called "Longport."

Several years ago the complainant erected a farm-house, with some out-buildings, in about the middle of the tract now in controversy, and it has been occupied ever since by a tenant under him, who has kept cows and cattle which ranged over and depastured upon the whole tract. The complainant, and his predecessor in title, Mr. Long, have also paid taxes upon it, and the riparian commissioners granted to Mr. Long a strip of land under water surrounding the same. The complainant has also for a long time been in undisputed possession of the lands lying immediately northeasterly of the disputed premises, which comprise a portion of Longport, and which have been actually laid out into streets and built upon. These circumstances, I think, show actual possession sufficient to satisfy the demands of the statute and establish the jurisdiction of the court. No action at law is pending, or could be brought by complainant, to test the title.

The complainant being in possession, the burthen is cast upon the defendant of showing its title, and that it is superior to the complainant's. It becomes the actor. *Beale* v. *Blake, 18 Stew. Eq. 668.* Indeed, as I interpret the act, the complainant need not have set out his title in his bill. He has, however, done so, giving the same description as that contained in the commissioners' deed, with a distinct allegation that it includes the land in question. This allegation defendant denies in its answer.

The description contained in the commissioners' deed to Overshine of February 14th, 1854, and repeated in all the subsequent conveyances constituting the complainant's chain of title, is as follows:

"All that certain tract of land situate on said beach (it being lot No. 32 in the report of said sale) bounded as follows: Beginning at a stake and at low-water mark or the surf, and at the south corner of Lot No. 31; and runs (1st) along by low-water mark south, forty-eight degrees west, about thirty-five and a half chains to a stake; thence second (2) south, sixty-one degrees west, nineteen chains and three-quarters; thence (3) south, eighty-nine degrees west, seven and a half chains, adjoining to the Egg Harbour Inlet; thence (4) north, thirty-nine and three-quarter degrees west, thirty and one-quarter chains, to the mouth of the Beach Thoroughfare; thence up the same (5) north, forty

degrees east, sixteen and a quarter chains; thence (6) north, fifty-nine degrees east, about thirty-eight chains and seventy-five links to the line of Lot No. 31; thence (7) in the line of Lot No. 31 south, forty-five degrees east, about thirty-eight and a quarter chains, to the place of beginning—containing two hundred and fourteen acres, more or less."

The lot No. 31, to which reference is here made, is one of thirty-two lots into which the orphans court commissioners before mentioned divided the whole tract for the purposes of sale, and lot No. 32 is the one above described. The whole tract as shown by their map, which has been preserved, is about five miles long and from a half to a mile wide, and lot No. 32 was the most southwesterly. The whole tract was bounded on the southeast for about half its length, commencing at the northeast end, by a narrow tidal stream (now filled up) called "Inside thoroughfare," which then divided the main Absecon beach diagonally, and for the other half by the ocean; on the southwest by Great Egg Harbor inlet, and on the northwest by an inland sound called "Beach thoroughfare." (This is an inland navigable sound, reaching from Absecon inlet to Egg Harbor inlet.) Monuments still in existence render the beginning corner of the lot in question reasonably certain, and there is no dispute but that a survey of the tract according to course and distance fails at this time to reach Great Egg Harbor inlet, and falls so far short as to leave about one hundred and fifty acres of land at the extreme point outside its boundaries. The complainant contends, nevertheless, that interpreted by the circumstances as they existed at the time, with the aid of the words found in the third and fourth courses, viz., "adjoining the Egg Harbor Inlet" and "the mouth of Beach thoroughfare," the description must be construed as going to Egg Harbor inlet, upon the principle that courses and distances must yield to monuments.

The defendant makes two answers to this position—*first*, it says that that rule has not strength enough to carry this survey so far—about half a mile—as to include the land in question; and, *second*, that as a matter of fact, at the time the partition was made there actually existed an inlet of water, leading from the Atlantic ocean to Beach thoroughfare, substantially coinci-

dent with the fourth course of the commissioners' deed, which at that time answered the call for Egg Harbor inlet, and hence there is no occasion to stretch the survey so violently as complainant's contention requires.

The undisputed facts are, that previous to 1831 Absecon beach—the southwest part of which was called "Sand Hill beach," and the part separated from the sea by Inside thorough-fare was called "Inside beach"—was, as now, substantially an unbroken beach leading from Absecon inlet to Great Egg Harbor inlet; that in the year 1831, in a violent storm, the sea broke across the beach about three-quarters of a mile northeast of the southwest point and formed a new inlet from the ocean to Beach thoroughfare, or, as it was sometimes called at that point, "Ris-ley's channel;" that new inlet remained open and was navigable for light-draught vessels up to the year 1853, when, or shortly before which date, it began to shoal, and in 1854 became entirely closed, and since then no signs of it have existed. In the mean-time Great Egg Harbor inlet retained its original width—about a mile—depth and appearance. The effect, however, of the breaking through of the new inlet was to form a sand-bar or shallow place at the mouth of Beach thoroughfare, being the point of junction of that sound with Great Egg Harbor inlet, so as to confine the navigation at that point to very small vessels; and most of the sea-going vessels that traded up Beach thorough-fare, and the waters to which it led, were obliged to go in and out of this new inlet, so that there was substantially no naviga-tion for vessels of ordinary size from Great Egg Harbor bay and its waters to the ocean through the new inlet of 1831; and, in point of fact, it never was known as "Egg Harbor inlet," but always as "New inlet" or "Risley's inlet." The land now in dispute, or so much of it as was then above water, was from 1831 to 1854, and at the time of the proceedings in partition which culminated in the commissioners' deed, an island. Its size and its height above sea-level was a matter of serious dispute, and about which much contradictory evidence was given on both sides.

In or about the year 1841 the federal government made a survey of those waters, which resulted in an official map, which has been put in evidence. That map shows the island to be comparatively small, of irregular shape and not at all like the present point of Absecon beach, and it also shows the new inlet to be nearly three-fourths of a mile in width; and when the plot of lot No. 32, as described in the commissioners' deed, is placed upon the government map, it would appear that nearly the whole of it was under water in 1841. The evidence as to the width of this new inlet at high and low tide in 1853 and 1854, as given by living witnesses, is quite indefinite and unsatisfactory. They fix the location of the navigable channel by a small tidal stream which entered Beach thoroughfare from the northwest, and they say that the channel was directly southwest of the mouth of this stream.

It is here to be observed that the survey made by the commissioners, for the purpose of division into lots and sale, was to low-water mark in all cases, and such I understand in those days was the universal custom in West Jersey, it being understood there that the private titles ran to low-water mark and were not limited by high-water mark. But taking the new inlet as the evidence shows that it appeared at low water, and locating it as well as it can be done from the uncertain evidence of witnesses, it seems to me sufficiently clear from the weight of the evidence that the fourth course of lot No. 32 was not coincident with low-water mark on the northeast side of the new inlet, but that, in point of fact, the description of that lot laid on the ground according to strict course and distance, with a correction in one of the courses to make the survey close, would include the whole or a greater part of the new inlet as it then existed, and would probably touch the northeast end of the island as shown on the government map. But independent of that aspect, I am unable to follow the defendant's counsel to the conclusion he aims at, viz., that the new inlet answers the call in the deed of "Egg Harbor inlet." It was well said by the counsel of the complainant that Egg Harbor inlet as a monument was as notorious as could be well imagined, and that it would require very strong proof to

lead to the conclusion that the commissioners could. have called
the new inlet "Egg Harbor inlet." They were all men living·
in the neighborhood, thoroughly acquainted with its geography
and the nomenclature of its waters, and of the seventy or more··
witnesses—mariners and fishermen—who were sworn on account.
of their familiarity with the neighborhood, not one, so far as I.
now recollect, swore that this new inlet was ever called Egg·
Harbor inlet. Nor do I think it could properly have been so·
called, for the reason before stated, viz., that owing to the bar
which formed across the mouth of Beach thoroughfare there
could be no navigation by sea-going vessels from the Atlantic·
ocean through the new inlet into Great Egg Harbor bay and·
waters. Besides, looking at the map of the neighborhood pub-·
lished by the state geologist, there appears to the northeast of
Great Egg Harbor two inland bays, called "Scull's bay" and·
"Lake's bay," the latter a large sheet of water upon which is an
important landing, called "Smith's landing." These waters·
connected with the ocean by Risley's channel, which runs from·
there southeasterly until it meets Beach thoroughfare, and thence·
the two combined run southwesterly to Great Egg Harbor inlet.
The combined waters were called, indiscriminately, "Risley's·
channel" and "Beach thoroughfare," and the true mouth of the··
latter was at its junction with Risley's channel, two and a half
miles northeast of Great Egg Harbor inlet. Now if this new·
inlet was to be named, as is Egg Harbor inlet, by the waters·
which it vented, I should say it would be more properly called.
"Risley's inlet" than "Great Egg Harbor inlet," and the an-··
swer admits that it was sometimes so called.

In this connection the defendant further argued from the use·
of the words, "the mouth of Beach thoroughfare," that the com-
missioners, in preparing the description, must have meant the·
actual mouth of Beach thoroughfare, which, owing to the forma-
tion of the bar before mentioned, was then at the new inlet,.
instead of Great Egg Harbor inlet; but the particular reach of
water originally known as the mouth of Beach thoroughfare or·
Risley's channel, and which was at the point of the junction of·
that sound with Egg Harbor inlet, still remained, and was still,.

if ever, properly called the mouth of Beach thoroughfare, although unnavigable for large vessels, and could not have been properly called by any other name.

I stop here to state parenthetically that about half of a book of eight hundred pages of printed evidence is taken up with evidence on the one side and the other, highly contradictory in its nature, as to the condition of things in the immediate neighborhood of Egg Harbor inlet, Risley's channel and new inlet, prior to and in the year 1853. The complainant introduced a mass of evidence tending to prove that the island shown on the government map of 1841, and constituting what is now the point of Absecon beach, and the land in controversy, was in 1853 what was called by the witnesses "sand flat," covered by the tide and invisible at high water, and that a new beach had been formed in what had been and now is the mouth of·Beach thoroughfare, which was called "Little beach," and which connected with the main land, which main land was composed of salt marsh and was called "Ladd's hummocks;" that after the closing up of the new inlet in 1854 the waters broke through and carried away this new beach, and restored the mouth of Beach thoroughfare to its original condition and reformed and replaced the southwest point of Absecon beach now in controversy.

The defendant's witnesses strongly combatted this view, and swore and insisted that Beach thorougfare or Risley's channel remained unchanged except for shoaling at its mouth, which shoaling was washed away and cleared out by the change in the flow of the water resulting from the closing of the new inlet.

I have not found it necessary to decide which of these sets of witnesses—two score or more on each side—were correct; but I may say that the inclination of my mind is to believe that the defendant's witnesses were right, and this conclusion is fortified by the natural presumption, which would be against so violent a change as that sworn to by the complainant's witnesses, and I shall assume for the purposes of the cause that the defendant is right in its contention in this behalf.

Returning now to the real question in controversy. Both parties appeal not only to the language of the description itself,

12

but to the general intention of the parties, to be derived from their cotemporaneous sayings and doings in connection with the circumstances.

The premises in question, several years prior to 1853, had belonged to Daniel Baker and John Tilton as tenants in common. Both of those persons died prior to 1853, and the title became vested in a great number of persons as tenants in common. Daniel L. Collins and Joseph Ireland bought up several of these shares, and in April, 1853, they, with Daniel Baker, Jr., applied to the orphans court of Atlantic county, by petition, for a partition, and by their petition set forth how the title was held. It now appears, or is contended by the defendant, that they were mistaken as to one undivided thirty-fifth part, and that as to that share the commissioners' deed conveyed no title. But it was not contended that it has become vested in the defendant, and so may be left out of view.

The petitioners describe the land in their petition as follows :

. "A certain tract of land and marsh on an island known by the name of Inside Beach and Sand Hill Beach, in the Township of Egg Harbor in said County [of Atlantic], it being the same tract formerly owned by Daniel Baker, Senior, deceased, and John Tilton, deceased, containing 550 acres."

The island here referred to, it should be remarked, is evidently the whole island now known as Absecon beach, bounded by the ocean on one side, Beach thoroughfare on the other and at the ends by Absecon and Great Egg Harbor inlets.

With regard to the inference to be drawn from the language of this description, which is repeated in the order for partition made by the court, defendant's counsel make the following point : They say that the quantity of five hundred and fifty acres is derived from two proprietary surveys of five hundred acres and fifty acres, respectively, made to Cox and Spicer, April 22d, 1716, and an including survey made to James Somers, April 3d, 1741, for one thousand one hundred and fourteen acres, which covers the same tracts included in the Cox and Spicer surveys and leaves five hundred and sixty-four acres of additional land ; that these three surveys did not and do not reach the land in

question ; and that, in order to do so, resort was had to a fourth survey, to James Verree, of October 13th, 1773, for fifty-nine acres. The description of this Verree survey shows that it bounds the James Somers including survey and lies to the southwest of it and between it and Egg Harbor inlet, and covers all the intervening land, including that here in controversy. From these data defendant argues that the number of acres given in the description contained in the petition to the orphans court shows that it included only the Somers survey, and not the Verree survey. In confirmation of this, counsel relies on the further circumstance that the title of the Verree fifty-nine acre survey was united with that of the Somers survey by deed from Joseph E. West, executor of George West, deceased, to Baker and Tilton, dated December 8th, 1829, but not recorded until December 21st, 1880. From this circumstance defendant argues that Collins, Ireland and Baker, petitioners in the partition proceedings, did not know that they owned the land covered by the Verree survey, and did not apply for its partition, and that its partition or sale was not ordered or confirmed by the orphans court.

To this argument complainant makes the following answer : The chain of title set out by defendant's answer contains several conveyances of the premises made prior to the date of the West deed to Baker and Tilton and of the opening of the new inlet. The earliest of these put in evidence is a deed from Benjamin Wilkins, sheriff, to Baker, Cook and Tilton, dated November 16th, 1821, in which the premises are described as follows :

"All that certain or several tracts of land and marsh situate, lying and being in the township of Egg Harbour, * * * being an island generally known by the name of Inside Beach and Sand Hill Beach, and is bounded *on the south-west by Great Egg Harbour Inlet*, on the southeast from Great Egg harbour by the ocean to the little inlet, and from thence by the waters that separate it from the Absecum Beach, by the Northeast, and Northwest by the Beach Thoroughfare (so called), within which bounds is said to contain five hundred and fifty acres, more or less; the deed from Isaac Cooper to the heirs of the said Hasadiah Samson conveys only such part as lies within the following boundaries [viz.] : Beginning at John Somers' line (so called) a little to the South of the Great Hammock where a ditch is cut as a line across said beach, a Division line between John and Lemers Somers, thence from said ditch to the Southwest, bounded on the Northwest of the beach Thoroughfare to Great

Egg harbour Inlet, on the Southwest by the ocean to the little inlet, from thence by the waters that separates it from Absecum beach, the several courses thereof to the above mentioned ditch, which is considered to contain the whole of the beach and marsh to the Southwest side of said Ditch from beach Thoroughfare to the main ocean to the Southwest of Great Egg harbour above Inlet."

The "Little inlet," long since closed, mentioned in this description, was situated about three miles northeast of Egg Harbor inlet and must not be confounded with the new inlet of 1831. It opened from the ocean to the inland water called "Inside thoroughfare" (before referred to), which divided the main beach diagonally, and all to the northeast of it was called, *par excellence*, "Absecon beach," and the part that lay to the southwest of it was called "Inside beach" and "Sand Hill beach," being, in fact, all one beach, but so much as was separated from Absecon beach by the Inside thoroughfare was called "Inside beach," and so much as was washed by the ocean was called "Sand Hill beach."

In the deed from Richman to Wilson, dated March 14th, 1825, also found in defendant's chain of title, it is described as follows:

"Being an island generally known by the name of the inside beach and sand hill beach, *and is bounded on the South west by Great Egg harbour inlet*, on the South east from Great Egg harbour inlet by the ocean to the little inlet, from thence by the waters that separated it from Absecum Beach by the North East, and Northwest by the beach thoroughfare (so called), within which bounds is said to contain five hundred and fifty acres of land marsh &c. be the same more or less."

This last description is repeated in a deed, also in defendant's chain, from Wilson to Hilyard, dated May 9th, 1834, two years and more after the new inlet was formed, and again in a deed from Hilyard to Mark Ware, dated July 15th, 1835, and again in a deed from Ware to Baker and Tilton, dated May 9th, 1837. Baker and Tilton already had title to the Verree survey by deed from West, but the language of the description in the orphans court petition was evidently taken by the counsel or surrogate who prepared it from the deed from Ware to Baker and Tilton,

McCullough v. Absecon Beach and Land Imp. Co.

which manifestly included all the land to the Great Egg Harbor inlet under the name of " Inside beach " and " Sand Hill beach," and within the quantity of five hundred and fifty acres ; and in addition to this is the reference to the ownership by Baker and Tilton. This, as it seems to me, is a complete answer to the contention that the partition proceeding did not deal with the land here in controversy. The argument from the quantity, five hundred and fifty acres, mentioned would exclude the five hundred and sixty-four acres addition surveyed for Somers, as well as the fifty-nine acres surveyed to Verree, and thus is shown to reach too far. The fact is that it must have been well known that the tract included much more than five hundred and fifty acres.

. Again, both Collins and Ireland knew the true situation at and near the inlet. They acquired title to the share they held by four several conveyances, two dated December 8th, 1849, one dated January 15th, 1850, and the other dated January 22d, 1850, all from the Tilton heirs. In those of December 8th, 1849, the tract is described as follows :

"Beginning at the mouth of the creek called the Big Shell Creek, which empties into Beach Thoroughfare and near where said Thoroughfare empties into Broad Thoroughfare; thence along the middle of said Shell Bed Creek a southeast direction to a ditch; thence along said ditch a southeast direction to the waters of what was formerly called Little Inlet; thence along said Little Inlet a southwest direction to the head thereof; from thence a southeast direction to the sea side at low water mark; thence binding the seaside at low water mark a southwest direction, *crossing the New Inlet to Great Egg Harbour inlet ;* thence a north westerly direction by Gt. Egg Harbour Inlet to Ladds Hammocks; thence by the same and the waters of the New Inlet a northeasterly direction to the mouth of Beach Thoroughfare, being the southwest mouth of said Thoroughfare where it empties into Risleys Channel; thence binding the various courses and distances of the said Beach Thoroughfare to the place of beginning. Containing *three thousand acres* be the same more or less and in which is included Inside and Sand Hill Beaches with the sand flats, salt and low sedge marsh adjacent thereto."

And in those of January, 1850, it is described as follows :

Beginning at the southwest mouth of Beach Thoroughfare and from thence northeasterly the various courses and distances of the said Beach Thoroughfare to the mouth of the Big Shell Bed Creek, which creek puts out of the

aforesaid Thoroughfare near the northeast mouth thereof, from thence binding up said creek by the middle thereof & adjoining lands of Jeremiah Risley southeasterly till it comes to a line ditch; thence binding said ditch still southeasterly to the little Inlet as *use* to be called; thence binding the Little Inlet southwesterly to the head waters thereof; thence southeasterly to the sea side at low water mark; thence binding the sea side at low water mark southwesterly *crossing the New Inlet to Great Egg Harbour Inlet;* thence northwesterly binding the last named inlet to Lads Hammocks; thence binding the same and the waters of the New Inlet to the place of Beginning, Containing *three thousand acres* be the same more or less, Two thirty-fifths is hereby conveyed or intended so to be & in which is included Inside and Sand Hill *beeches* with the sand flats, salt and low sedge marsh adjacent thereto."

The originals of these last two deeds were produced, and are both in the handwriting of Daniel L. Collins. A comparison of the description in the deeds of December, 1849, with that of those of January, 1850, shows that they are substantially the same. The first commences at the extreme northerly point of the tract, five miles distant from Egg Harbor inlet, and runs thence by Inside thoroughfare to the ocean, and thence to the Great Egg Harbor inlet, and thence by Risley's channel and Beach thoroughfare to the beginning. The last commences two and a half miles from Egg Harbor inlet, at the junction of Beach thoroughfare and Risley's channel, that being, as I have before pointed, out the true mouth of Beach thoroughfare, and runs thence northeasterly and so onward to the beginning.

The matter to be remarked of these descriptions is that they all expressly notice the new inlet and cross it, and expressly include the land in question.

Now the complainants argue from this, and I think with some force, that Collins and Ireland were the actors in the proceedings which they procured to be instituted for the purpose of having their shares in these lands either set off to them in severalty or its equivalent in money, and it is not probable that they would intentionally omit any part of them from the proceedings, especially after taking so much pains to include all in the conveyances by which they acquired their interests.

A circumstance much relied upon by the complainant in this connection is the advertisement made by the commissioners. The record shows this to have been in *The West Jerseyman*, a news-

McCullough v. Absecon Beach and Land Imp. Co.

paper published at Camden, and its files of that date have been preserved and the description found in it is as follows: ·

"The following described real estate situate on the Sand Hill Beach, or what some call Inside Beach, late the property of John Tilton and Daniel Baker, Esquires, deceased, and is bounded as follows: On the northwest by the Beach Thoroughfare, and *on the southwest by Egg Harbor Inlet;* on the southeast by the ocean, and on the north and east by Absecon Beach, and contains twenty hundred acres, be the same more or less."

The next matter relied upon by the defendant is a map made by Mr. Somers, one of the commissioners, who was a surveyor, showing the actual divisions by which the lots were sold, and which was used by the commissioners at the sale, which took place on the ground in November, 1853. It is proven that certain cedar stakes driven deep in the ground still remain upon the division lines shown on this map, and hence it must be inferred that those division lines were actually surveyed on the ground. The map also shows the lines of the northwest shore of the tract, bordering on Beach thoroughfare, with indentations and with substantial accuracy, and it also shows a matter which I deem of considerable importance, viz., the lines of the opposite shore of Beach thoroughfare, but without any of its creeks or indentations, not even the mouth of Risley's channel; also the lines of both sides of the Inside thoroughfare, above mentioned, which divides it from what was then called Absecon beach proper. The thoroughfares and indentations are colored green, and so is a wide strip for the ocean on the southeast side; also one at the southwest end along the fourth course of lot No. 32, which is thereby shown to be bounded on water, whether the new inlet or old is the question. This map is on a scale of ten chains to the inch. The shape of lot No. 32 is an oblong square, about thirty-five chains wide and fifty-five chains long, with the south and west corners slightly rounded. Beach thoroughfare is so marked, and the ocean is marked "surf," but no designation is put upon the waters of the inlet. Beach thoroughfare is laid down as about one-eighth of a mile wide, making about one inch on the map, except at its mouth, where it is spread to more than twice that width. "Inside thoroughfare" is laid down about one-quarter

of an inch wide. The strip of green along the surf side is about two inches wide on the map, equal to half a mile, and continues of that width around the end of the beach and along where the water of the inlet is intended to be shown. The margin of blank space left on the southwest end of the map opposite the fourth course of lot No. 32, and which occupies the place of the inlet, is three inches, equal to three-eighths of a mile. I have already shown that a plot of lot No. 32 properly placed upon the government map makes the fourth or southwest course almost reach or touch the northeast end of the island shown by the government map between the new and old inlet, being the premises in dispute; so that almost the whole of lot No. 32 was, according to the government map, covered with water. But supposing, as I have no doubt the truth is, that the government map delineated high-water lines, and knowing, as we do, that the commissioners' map was intended to show low-water lines, and further supposing —in aid of defendant's contention and theory—that the navigable channel of the new inlet lay on the extreme southwest side of it, and that lot 32 could be so surveyed as that its fourth course ran along the northeast side of the new inlet at low-water mark, it follows that—if any reliance is to be placed on the government survey—the new inlet at low water was not more than one or two hundred feet wide; and in fact some of the witnesses put it at about that width. If not more than one or two or even three hundred feet wide, it would occupy on the map, if delineated, not more than a quarter or half an inch in width. Now, two questions just here seem to me to be pertinent:

First. If the commissioners took the pains and trouble, as they did, to show the width of the water-ways—Beach thoroughfare and Inside thoroughfare—surrounding the whole tract on the northwest and northeast, and to delineate the lands lying opposite those water-ways, why did they not do the same thing on the southwest? Why did they not show—having ample room on the paper to do so—the island lying on the other side of the little inlet, and separated from the land to be sold by so narrow a strip of water?

McCullough v. Absecon Beach and Land Imp. Co.

*Second.* If the southwest end was bounded by a narrow inlet only two or three hundred feet wide—half an inch on the map—why put in its place a broad green strip—two inches wide—indicating a broad expanse of water?

Great Egg Harbor inlet, it should be observed, was a full mile wide, and there was not room on the map to show the opposite point. Now, it seems to me that the wide strip of green ocean on the map at this point, and the absence of any delineation of the narrow inlet, channel, and of the shore of the island on the opposite side of it, is quite significant, and indicates, with much clearness, that the commissioners did not intend to say by their map that the southwest boundary of lot No. 32 was the new inlet, but rather that it was Egg Harbor inlet. Then, again, the widening of the mouth of Beach thoroughfare, as shown on the map, corresponds with the actual topography at its debouch into Great Egg Harbor inlet, but not with that of the locality just opposite the new inlet.

Still the questions remain, what shall be done with the actual courses and distances of this lot No. 32, and, if the water shown along the fourth end of it is not New inlet, and if it is intended to be shown as the water of Egg Harbor inlet, where, upon the map, are the waters of New inlet, and why was it altogether omitted?

Dealing first with the courses and distances, the rule relied upon by the complainant, that the courses and distances must yield to monuments whose identity are established beyond dispute, is a practical one, and must be more or less limited by the particular circumstances and by the purpose for which it is invoked. It had its origin in the liability of surveyors to make mistakes in handling the instruments of measurement, and in recording the observed results. It had in view an actual measurement and observation to and from fixed objects, and it dealt with such variations from actual verity as might be believed to be the result of accident and imperfect work and observation—that is, of accident or mistake and of design. In such cases the application of the rule is simple, and one of evidence merely. Applying it here, and assuming that Mr. Somers actually ran

upon the ground the several courses and distances of lot No. 32,. and assuming, for present purposes, that the call "adjoining to the Egg Harbor inlet" was intended to be a call for the true Egg Harbor inlet, and not for the New inlet, and that the fourth course was intended by him to be understood as running along the true inlet, I am, of course, unable to believe that he actually ran by chain and compass to the true inlet, and intended to record the courses and distances truly as he found them, and by *accident* or *mistake* made them shorter. I find it impossible to believe that he could have made so great a mistake as he must have done on that hypothesis, and which involves a shortening of the distance on two of the side lines to the extent of fifty chains or more.

But monumental calls in the descriptions of land have come to have a higher and broader reach than merely to ascertain and correct mistakes in measurements and observations. They serve as descriptions in themselves of the land to be dealt with, quite irrespective of the courses and distances. So that, where the monumental calls are complete in themselves, and are fully identified, they override courses and distances, by force of the maxim *falsa demonstratio non nocet*, and also operate by way of estoppel against the grantor. To illustrate : if a grantor of a farm describes it as beginning at a cross-roads, and running thence along one of the roads to a certain stone fence ; thence along the stone fence to a brook ; thence along the brook to the other of the two roads, and thence along that road to the beginning, the use of such description, when the monuments exist and are undisputed, is tantamount to taking the grantee on the ground and showing him those monuments as the boundaries of the farm to be conveyed, and the courses and distances, if any,. given in the description are absolutely of no consequence whatever, and the purchaser is justified in entirely ignoring them. In short, as I understand the rule, where monuments are called for at each corner, or along each line, and are thoroughly identified,. then courses and distances are of no value. And where monuments are called for, the only use of the course and distance is to assist in finding and identifying them, and for that purpose they

may be, and often are, of great value, where as often happens, the monumental calls are for heaps of stones and marked trees, and the like, whose identity is naturally open to dispute.

Turning now to the description in hand and applying it to the ground. We commence at a fixed point, about which there is no dispute, in the edge of the surf at low-water mark, and we run southwesterly "along low-water mark" the given distance, and we continue another short distance in the same general direction without mention of any monument—but I think it plain that the inference is that it is still along low-water mark; then we go nearly due west the given distance "*adjoining to* Egg Harbor inlet." Now "adjoining" means "touching," and it seems to me that, leaving out of view for present purposes the existence of New inlet, there can be no doubt that the language so far says unmistakably that we have been running along the shore and that we have reached Egg Harbor inlet, and if so, then the chaining is of no assistance or value, and a mere shortage of chain in the given distance will not stop us. Then we proceed northwesterly, the general course of the inlet, the given distance "*to the mouth of Beach thoroughfare.*" This call seems to me to be consistent with and to confirm the previous calls, and to show that we were running along the shore. Then we proceed "*up the same*"—Beach thoroughfare—the several courses and given distances, to a fixed monument on the shore of Beach thoroughfare about which there is no dispute.

Now, I think this rehearsal of this description shows it to be quite as clear and unmistakable, and quite as independent of mere distances, as that of the farm above supposed.

Turning, in the order of events, to the sale. It took place on the ground, and the bidding commenced at lot No. 1 at the extreme northeast end of the tract, and as the lots were bid off the commissioners proceeded toward the southwest, until they reached, according to one witness, lot No. 19, and according to another, lot No. 29, which last would be half a mile short of lot No. 32, and fully a mile short of the new inlet. From there the sales were made by the map alone, and without a view, and hence the importance of the map. There is no proof as to any

representations or statements made on the ground to the bidders by the commissioners or tenants in common, and therefore they must be presumed to be confined to what is contained on the map itself. But it is natural to suppose that if any explanation was made of the map by the commissioners, it was in accord with the monumental calls afterward inserted in the deed, and that bidders were told that the third course ran to Egg Harbor inlet, and the fourth to the mouth of Beach thoroughfare. But without any explanation, it seems to me that, for the reasons before stated, such would be the interpretation of the map itself, looked at by a bidder who had seen the advertisement.

Lot No. 32 was struck off to Samuel Overshine, but he failed to complete the purchase, and on the 14th of February, 1854, the commissioners made a deed of the lot to Isaac Barton, in which they recited the proceedings in partition, and the sale to Overshine and his failure to complete the purchase. That deed was acknowledged on the same day (14th of February) and recorded on the 11th of March, 1854. It was acknowledged before John H. Doughty, as commissioner. This gentleman was afterwards appointed a judge of the court of common pleas, and was sworn as a witness in the cause. Three years later, to wit, in July, 1857, Barton attempted to sell the premises, and counsel in examining the title criticised the conveyance by the commissioners to Barton, whereupon they executed a deed, dated on the 14th of February, 1854, to Overshine, and Overshine in turn conveyed to Barton by deed of the same date. The commissioners' deed to Overshine was acknowledged before Judge Doughty on the 21st of July, 1857. Barton, on the 20th of November, 1857, conveyed the premises to James Long for a consideration of $2,000. That conveyance was made under the supervision of the late Judge Carpenter, and on the back of it is a map of lots 31 and 32—the map of lot No. 32 is substantially like that shown on the commissioners' map—and shows a strip of water around three sides of it, is marked in Judge Carpenter's handwriting, on the southeast side "Atlantic ocean," on the northwest side " Beach thoroughfare," and on the southwest end " Inlet." Now, at that time it is admitted that the new inlet was closed

entirely, and the beach was all one beach ; and it seems to me·
that the description of that deed might properly be read by the·
grantee with a view to the then present situation.   On its face it
contained no reference to and gave no information that any such·
water as the new inlet had ever existed, and it seems to me that
the purchaser was fully justified in supposing that he was buying·
all the land between lot No. 31 and Egg Harbor inlet.   Long·
held the title until 1882, and while he owned it procured from·
the riparian commissioners a grant of the lands under water on·
all sides of it at an expense of $2,625.   Their grant extends·
from the established line between lots Nos. 31 and 32 on the·
ocean side, all the way around the point of the beach at Egg·
Harbor inlet and up Beach thoroughfare to the same line on that
side.   In 1882 Long conveyed the original tract, lot No. 32,
with the strip conveyed by the riparian commissioners, to the
complainant for the consideration of $150,000.

In 1881 or 1882 a Mr. Lummis, a surveyor, was employed by
one of the riparian commissioners to verify a survey previously
made by another surveyor for the purpose of the riparian grant,
and in doing that he discovered that the courses and distances of
complainant's deed did not reach and cover the southwest point
of the beach.   Shortly afterwards the scattered heirs of Baker
and Tilton were hunted up and conveyances obtained from most
of them, and the title concentrated in the defendant company,·
of which Mr. Lummis appears to be a stockholder and officer.·
From 1853 to 1885 none of the heirs or assignees of Baker and·
Tilton ever made the least claim to any of this property, although·
the great increase in value of all shore property was notorious.·

From this review of the case I think it clearly appears that·
Baker and Tilton were the owners of the disputed premises and·
died seized of them ; that Collins and Ireland, who became·
seized of an undivided interest in them, knew of such owner·
ship ; that the premises in question were included in the descrip-·
tion of the lands contained in the petition for partition ; that the·
promotors of the partition proceedings and the commissioners·
intended to sell them, and they, and all parties interested, sup·
posed they had sold and conveyed them as a part of lot No. 32,·

and that Overshine and Barton each supposed he was buying and had obtained title to them. So much for the intention of the parties to the transaction.

It remains to inquire whether this intention was actually carried out by an apt conveyance, for it must be borne in mind that the bill does not seek to reform the deed, but is based upon a perfected and finished conveyance, and I think it is important, if not actually necessary, to account for the shortness of chain found in this deed in connection with the existence of an inlet quite nearly corresponding in position, though not in name, with that called for in the description; or, perhaps, the situation may be more accurately stated by saying that it must appear that the presence in the description of the given courses and distances is not absolutely inconsistent with the construction in question.

Now, after a very careful consideration of the case in all its bulk, with the assistance of full and able arguments on both sides, I think I am able to account for this shortage, and also for the absence of any delineation of New inlet on the map, satisfactorily at least to myself. At the date of the survey the land to the southwest of lot No. 31, and including the point of beach, by which name the land now in dispute was known, was of very little value. It was mostly low, flat sands, much of it covered with water at high tide, and a comparatively long distance from the terminus of the contemplated new railroad. The new inlet was known to be shoaling, and was understood to be liable, and I think I may say likely, to be obliterated at any time. These circumstances induced the commissioners, with the consent, no doubt, of the parties in interest, to, so to speak, consolidate and bunch together the scattered and half-sunken sands lying southwest of lot No. 31 into one lot, and so condense it in quantity as to make up in a measure for what it lacked in quality, and the description actually used was the result. It is possible, and there is some evidence tending to show that it is probable, that they crossed the new inlet and surveyed the beach quite to Egg Harbor inlet. If so, then they afterwards shortened or eliminated the courses with the result given. There are indications

McCullough v. Absecon Beach and Land Imp. Co.

of this in the description itself. The first course is given as " about " thirty-five and one-half chains, and the sixth, which is opposite the first, is given as " about " thirty-eight chains and seventy-five links. Observe here that each of the seven courses in the description is given as having a fraction of either a quar- ter, a half or three-quarters of a chain ; that is, twenty-five links, fifty links or seventy-five links. Now, what does the word " about " mean in such connection? What is its force? Is it not notice to the reader that reliance must not be placed upon the distance, but rather upon the monument called for? . Again, the survey does not close even after making a change of ten degrees in the second course as suggested by defendant's counsel, and in that respect is consistent with the notion that it may have been cut down and reduced in size from its actual proportions.

Another not unreasonable, as it seems to me, supposition is that, supposing the survey of lot 32 could have been and was actually made by the courses and distances given, and to have stopped at the new inlet, then the commissioners, in due course, came to the island, and, upon consideration, concluded to bunch it or throw it in with lot No. 32, and to accomplish that purpose inserted the word " about " in the first and sixth courses, and the calls for Egg Harbor inlet and the mouth of Beach thoroughfare, for the purpose of carrying the survey to those points without changing the courses or distance or making an actual survey.

I think either of the modes just indicated are not improbable, in view of the well known practice of that kind which prevailed in West Jersey for so many years in making proprietory surveys. It is a matter of history that many of those surveys, when run by the monumental calls, contained several times as many acres as they called for and as their strict courses and distances would include. The proprietors were, by this means, defrauded of vast quantities of land, it being uniformly held by the courts that the monuments must govern. They finally refused to act upon any survey which called for more than one monument, and that must be the beginning point. Instances of these surveys are found in *Lippincott* v. *Sander, 3 Hal. 161;*

McCullough *v.* Absecon Beach and Land Imp. Co.

*Curtis* v. *Aaronson, 20 Vr. 68 ;* and Justice Ford refers to them in *Corlies* v. *Little, 2 Gr. 371* (at *p. 374*).

The Verree survey, by which the title to the lands in question passed from the proprietors, states that it contains fifty-nine acres, but, in point of fact, it contains three or four hundred acres. And so late as 1869, Samuel S. Downs, a deputy surveyor, made a proprietary survey, for Charles H. Tatum, of the southwest end of Absecon beach, including both lots Nos. 31 and 32 and a part of lot No. 30, and, as clearly appears by his map, intended to include the whole of the point, yet when his survey is put upon the ground it will not reach it by a quarter of a mile. In fact, the practice of using monuments to compress into given courses and distances two or three times the quantity of land they will contain is a familiar one in West Jersey, and is, in my judgment, a sufficient explanation of the peculiarities of the description which have given rise to this controversy. It at the same time illustrates the great values which our courts have always set upon monumental calls as against mere courses and distances.

Now, with this possible explanation of the difficulties in question, and bearing in mind that the description, if applied to the land at any time in or after the year 1859, would have included, by well-settled rules of construction, the land in question, it seems to me it is now altogether too late for the heirs of Tilton and Baker to come forward and say that, in 1853, when this survey was made, there existed an inlet which answered the call of Egg Harbor inlet, and which, at the same time, corresponded with the actual chains and courses of this deed. In order to succeed in such a contention, they ought, as it seems to me, to show very clearly that such was the known intention of the parties to the transaction. The burden of accomplishing this is clearly upon them, and I think they have entirely failed to sustain it.

For these reasons, I shall advise a decree that the complainant's title must prevail.